Centuori v. United Parcel Service, Inc., Not Reported in Fed. Supp. (2017)

Case 1:19-cv-00354-JL   Document 16-5   Filed 08/22/19   Page 1 of 8

2017 WL 1194497
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

Mark CENTUORI, Plaintiff,
v.
UNITED PARCEL SERVICE, INC., Defendant.

CASE NO. C16-0654JLR
|
Signed 03/30/2017

**Attorneys and Law Firms**

Matthew N. Menzer, Menzer Law Firm, Seattle, WA, for Plaintiff.

David M. Poore, Eric Peter Gillett, Preg O'Donnell & Gillett, PLLC, Seattle, WA, for Defendant.

ORDER

JAMES L. ROBART, United States District Judge

## I. INTRODUCTION

***1** Before the court is Defendant United Parcel Service, Inc.'s ("UPS") motion for summary judgment. (Mot. (Dkt. # 12).) Plaintiff Mark Centuori opposes UPS's motion. (Resp. (Dkt. #17).) The court has considered the parties' briefing, the relevant portions of the record, and the applicable law. Considering itself fully advised,[1] the court GRANTS in part and DENIES in part UPS's motion for summary judgment for the reasons articulated below and GRANTS UPS leave to file a *Daubert*[2] motion in the manner described below.

## II. BACKGROUND

This negligence action arises from personal injuries that Mr. Centuori incurred moving three packages that UPS misdelivered at his home. (*See generally* Compl. (Dkt. # 1-1).) UPS received those packages into "Pre-Load" on the morning of January 12, 2015. (Norby Decl. (Dkt. # 13) ¶ 3.) However, UPS discovered an improper address on the packages and redirected them to the Exception Capture System ("ECS") station. (*Id.*) At ECS, the clerks check approximately 1,000 packages per day, approximately 200 of which are for Pre-Load. (*Id.* ¶ 5.) The clerks' task is to check addresses flagged as incorrect and, if necessary, generate new address information "based on information returned by UPS's internal address verification system." (*Id.* ¶ 4.)

Assuming UPS applied its normal procedures to the three packages at issue, it would have redirected the packages to the ECS station because the shipper used a nonexistent address. (*Id.* ¶ 6.)[3] At the ECS station, UPS typically compares the improper address to its CardFile, which catalogues previously encountered addressing errors. (*Id.* ¶ 7.) If the addressing error had not been encountered previously, UPS performs a web address lookup on its internal system. (*Id.* ¶ 8.)

Case 1:19-cv-00354-JL   Document 16-5   Filed 08/22/19   Page 2 of 8

Centuori v. United Parcel Service, Inc., Not Reported in Fed. Supp. (2017)

Here, the shipper addressed the boxes to 14034 1st Avenue South, Seattle, WA 98177. (*Id.* ¶ 6.) As it turns out, this address contained an incorrect city and zip code; the proper address for the intended recipient was 14034 1st Avenue South, Burien, WA 98168. (*Id.*) However, UPS's web address lookup system appears to have concluded that the shipper had committed the common error of entering the wrong street direction. (*Id.* ¶¶ 8-9.) The web address lookup system determined that Mr. Centuori's address —14034 1st Avenue Northwest, Seattle, WA 98177—was likely the intended address. (*Id.*) UPS printed "corrected" labels and delivered the boxes to Mr. Centuori's home on January 12, 2015. (*Id.* ¶ 10.)

On the morning of January 17, 2015, Mr. Centuori discovered the boxes outside the side entrance of his home. (Poore Decl. (Dkt. # 14) ¶ 1, Ex. 1 ("Centuori Dep.") at 11:22-12:5.) Two of the boxes were stacked against the side door, and the third box was "in a tumbled position resting against the bottom step on the sidewalk to the porch." (*Id.* at 26:10-13; *see also id.* at 28:21-23 ("There may have been a small gap, but the door was not able to be opened out.").) Although Mr. Centuori was "virtually certain" that the boxes were not intended for him when he saw them, he decided to move them because they were blocking the entrance to the house and the sidewalk that connects the front and back portions of his lot. (*Id.* at 39:10-40:14.)

 **\*2** Although the boxes were "very heavy" (*id.* at 27:24, 31:21, 33:1-6), Mr. Centuori "maneuvered" each of them into his garage (*id.* at 27:18-19). He first removed the top stacked box by creating a "controlled tumble to get it on the ground." (*Id.* at 27:22-24; *see also id.* at 30:24-31:1.) As he started moving the first box, Mr. Centuori "felt some pain and a sensation" in his lower back. (*Id.* at 42:19-43:9.) Mr. Centuori cannot quantify the amount of pain he felt. (*Id.* at 44:9-45:8.) Notwithstanding the pain, however, he moved all three boxes into his garage through some combination of "push[ing]," "pulling," and "dragging." (*Id.* at 35:16-36:10.)

Mr. Centuori contends that UPS was negligent by "(1) fail[ing] to follow its own internal policies and procedures in correcting an inconsistent address; (2) le[aving] the packages at Mr. Centuori's home without his consent; and (3) le[aving] the packages obstructing an entrance to [his] home." (Resp. at 1.) He asserts that he has "suffered significant and ongoing injuries," including a herniated disc and spinal nerve impingement, as a result of UPS's negligence. (Compl. ¶ 7.)

### III. ANALYSIS

Before turning to UPS's motion for summary judgment, the court addresses two evidentiary issues.

**A. Mr. Centuori's Motion to Strike**
Mr. Centuori moves to strike paragraphs 6 to 10 of Mr. Norby's declaration for lack of personal knowledge. (Resp. at 17-19); *see also supra* n.3. In paragraphs 6 through 10, Mr. Norby describes how UPS's typical address correction process would apply to the three boxes that UPS misdelivered to Mr. Centuori. (Norby Decl. ¶¶ 6-10.) Mr. Centuori argues that although Mr. Norby lays a foundation for testifying to UPS's typical practices, he lacks a foundation to conclude that UPS applied those practices to these three packages. (Resp. at 17-19.)

The court agrees that Mr. Norby fails to lay a sufficient foundation to state what occurred to the packages at issue, but the court declines to strike the testimony. Instead, the court treats paragraphs 6 to 10 as background information regarding how UPS typically readdresses misaddressed packages, rather than as testimony regarding what occurred to the packages that UPS placed at Mr. Centuori's home.

**B. UPS's Motion to Strike**
Pursuant to Federal Rule of Evidence 702, UPS moves to strike the declaration of Peter F. Wade, Mr. Centuori's shipment and delivery expert. (Reply (Dkt. # 19) at 10-12.) The court's analysis of UPS's motion for summary judgment does not hinge on the admissibility of Mr. Wade's testimony. *See infra* §§ III.C.3-4. Moreover, because UPS filed this de facto *Daubert* motion as a motion to strike in its reply brief, Mr. Centuori has not responded to the motion. *See Daubert*, 509 U.S. at 592-94; Local

Case 1:19-cv-00354-JL   Document 16-5   Filed 08/22/19   Page 3 of 8

Centuori v. United Parcel Service, Inc., Not Reported in Fed. Supp. (2017)

Rules W.D. Wash. LCR 7(h) (disallowing a surreply in response to a motion to strike in the movant's reply brief). Mr. Centuori has therefore not had a meaningful opportunity to demonstrate the admissibility of Mr. Wade's testimony. *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (placing the burden on the expert's proponent to prove admissibility).

The court denies UPS's motion to strike without prejudice to raising the same argument in a *Daubert* motion. Although UPS's deadline to file a *Daubert* motion passed on March 21, 2017 (Sched. Order (Dkt. # 8); Am. Sched. Order (Dkt. # 16)), UPS timely raised the issue in its reply brief on February 3, 2017 (Resp. at 10-12). Accordingly, the court grants UPS leave to file a motion relating to the admissibility of Mr. Wade's testimony no later than Thursday, April 6, 2017, and to note that motion as a third-Friday motion. *See* Local Rules W.D. Wash. LCR 7(d)(3); *see also id.* LCR 7(e)(4) (setting the page limits for briefing on third-Friday motions). This procedure will allow Mr. Centuori a full opportunity to demonstrate the admissibility of Mr. Wade's testimony without prejudicing the parties' pretrial deadlines.

**C. Motion for Summary Judgment**

*\*3* Having resolved the evidentiary issues, the court articulates the applicable legal standards and then turns to the two arguments UPS makes in its motion for summary judgment: (1) the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501 *et seq.*, preempts Mr. Centuori's negligence claim; and (2) UPS did not owe a duty to Mr. Centuori. (*See generally* Mot.)

1. Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing that there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" to withstand summary judgment. *Galen*, 477 F.3d at 658. The non-moving party may do this by use of affidavits (or declarations), including his or her own, depositions, answers to interrogatories or requests for admissions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court may only consider admissible evidence when ruling on a motion for summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002). "Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment." *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982); *see also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment.").

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Only disputes over facts that might affect the outcome under the governing law are "material" and will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As framed by the Supreme Court, the ultimate question on a summary judgment motion is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

2. FAAAA Preemption

UPS contends that the FAAAA's express preemption provision precludes Mr. Centuori's negligence claim. (Mot. at 12-20.) That provision provides that states

Centuori v. United Parcel Service, Inc., Not Reported in Fed. Supp. (2017)

Case 1:19-cv-00354-JL   Document 16-5   Filed 08/22/19   Page 4 of 8

> may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

**\*4** 49 U.S.C. § 14501(c)(1).[4] The Supreme Court has recognized—and both parties acknowledge—that this preemption provision mirrors the preemption provision in the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) (citing H.R. CONF. REP. No. 103-677, at 82-83, 85 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1715, 1754-55, 1757) ("[T]he Congress that wrote the language before us copied the language of the air-carrier pre-emption provision of the [ADA]."); (*see also* Mot. at 14-15 & n.2; Resp. at 7.) Accordingly, interpretations of the scope of ADA preemption also apply to the scope of FAAAA preemption. *See Rowe*, 552 U.S. at 370 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)); *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1187 (9th Cir. 1998).

For the FAAAA to preempt state action, "the action must (1) derive from the enactment or enforcement of state law; and (2) 'relate to' [motor carrier prices], routes, or services."[5] *A.C.L. Computers and Software, Inc. v. Fed. Express Corp.*, No. 15-cv-04202-HSG, 2016 WL 946127, at \*2 (N.D. Cal. Mar. 14, 2016). The Supreme Court has concluded that common-law rules constitute state law in this context. *Nw., Inc. v. Ginsberg*, ––– U.S. ––––, 134 S. Ct. 1422, 1429-30 (2014). Mr. Centuori's negligence cause of action thus derives from state law.

The dispositive question is therefore whether Mr. Centuori's negligence claim is "related to" UPS's "services."[6] 49 U.S.C. § 14501(c)(1); *see Ginsberg*, 134 S. Ct. at 1430. The "ordinary meaning" of "related to" is "broad," and the Supreme Court has concluded that in the ADA and FAAAA, those "words ... express a broad pre-emptive purpose." *Morales*, 504 U.S. at 383; *Rowe*, 552 U.S. at 370-71; *see also Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014) (quoting *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring)) ("Because 'everything is related to everything else,' ... understanding the nuances of congressional intent is particularly important in FAAAA preemption analysis." (internal citation omitted)). "A claim satisfies this requirement if it has 'a connection with, or reference to,' [motor carrier] prices, routes, or services." *Ginsberg*, 134 S. Ct. at 1430 (quoting *Morales*, 504 U.S. at 384). A state action is not "related to" motor carrier prices, routes, or services only when its impact is too tenuous, remote, or peripheral. *Morales*, 504 U.S. at 390; *see also Duncan v. Nw. Airlines, Inc.*, 208 F.3d 1112, 1115 (9th Cir. 2000) (rejecting a broad definition of "related to" that focuses on imposing cost on the defendant because "all successful tort suits ... carry with them an economic cost for the defendant").

**\*5** "Service," in contrast, takes on a narrower definition that is limited by its context. *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265-66 (9th Cir. 1998), *opinion amended on denial of reh'g*, 169 F.3d 594 (9th Cir. 1999). Congress intended to leave to states the regulation of areas such as "safety, financial responsibility relating to insurance, transportation of household goods, [and] vehicle size and weight." H.R. CONF. REP. NO. 103-677, at 83-85, *as reprinted in* 1994 U.S.C.C.A.N. at 1755-57. The Ninth Circuit has not expressly defined "service" in the FAAAA, but it has repeatedly done so in the ADA context. "Congress used 'service' in [the ADA] in the public utility sense—i.e., the provision of air transportation to and from various markets at various times." *Charas*, 160 F.3d at 1266. In more concrete terms, " 'service,' when juxtaposed to '[prices]' and 'routes,' refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided." *Id.* at 1265-66. In contrast, "service" does not "reach the various amenities provided by airlines," *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 726 (9th Cir. 2012), such as "the pushing of beverage carts, keeping the aisles clear of stumbling blocks, the safe handling and storage of luggage, assistance to passengers in need, or like functions," *Charas*, 160 F.3d at 1266.[7]

Case 1:19-cv-00354-JL Document 16-5 Filed 08/22/19 Page 5 of 8

Centuori v. United Parcel Service, Inc., Not Reported in Fed. Supp. (2017)

Despite not expressly defining "service," the Ninth Circuit's FAAAA jurisprudence reinforces this narrow understanding. In *Dilts*, the court rejected the argument that the FAAAA preempts California's meal and rest break laws. 769 F.3d at 647. " '[B]road law[s] applying to hundreds of different industries' with no other 'forbidden connection with prices[, routes,] and services'—that is, those that do not directly or indirectly mandate, prohibit, or otherwise regulate certain prices, routes, or services—are not preempted by the FAAAA." *Id.* (quoting *Air Transp. Ass'n of Am. v. City & Cty. of S.F.*, 266 F.3d 1064, 1074 (9th Cir. 2001)) (second and third alterations in original). The Ninth Circuit has also held that the FAAAA does not preempt a California minimum wage statute that applied to public works because the statute's relationship to the defendant's prices, routes, and services was "no more than indirect, remote, and tenuous." *Mendonca*, 152 F.3d at 1187.

Owing in part to this narrow definition of "service," " '[w]here a plaintiff invokes traditional elements of tort law and the issue of preemption arises, 'the courts almost uniformly have resolved against federal preemption.' " *Jiminez-Ruiz v. Spirit Airlines, Inc.*, 794 F. Supp. 2d. 344, 348 (D.P.R. 2011) (quoting *Dudley v. Bus. Express, Inc.*, 882 F. Supp. 199, 206 (D.N.H. 1994)) (collecting cases). Indeed, the Supreme Court and the Ninth Circuit have repeatedly limited the circumstances under which the ADA preempts common law claims. In *Morales*, the Supreme Court concluded that the ADA preempted a state ban on deceptive advertising but indicated that some state actions may have too tenuous, remote, or peripheral a relationship to be preempted. 504 U.S. at 390. In *American Airlines, Inc. v. Wolens*, the Supreme Court held that the ADA did not preempt common law contract claims. 513 U.S. 219, 222 (1995); *see also id.* at 236 (Stevens, J., concurring in part and dissenting in part) ("In my opinion, private tort actions based on common-law negligence or fraud, or on a statutory prohibition against fraud, are not pre-empted."), 242 (O'Connor, J., concurring in part and dissenting in part) (collecting cases after *Morales* in which courts "allowed personal injury claims to proceed" because courts found "the particular tort claims at issue not to 'relate' to airline 'services' "). Following *Morales* and *Wolens*, the Ninth Circuit held that the ADA does not "immunize the airlines from liability for personal injuries caused by their tortious conduct." *Charas*, 160 F.3d at 1266. However, these cases make clear that the infrequency with which the ADA and FAAAA preempt common law claims is not based on a separate line of analysis; rather, it is an effect of applying ADA and FAAAA preemption doctrine. *See, e.g., id.*

3. Mr. Centuori's Theories of Negligence

**\*6** Mr. Centuori asserts that UPS (1) failed to follow its policies in correcting an inconsistent address, (2) left the packages at Mr. Centuori's home without his consent, and (3) left the packages obstructing an entrance to Mr. Centuori's home. (Resp. at 1.) The court concludes that the FAAAA preempts the second theory of negligence—failure to obtain consent—but does not preempt the first and third theories.

A commercial airline's purpose under the ADA is "provision of air transportation to and from various markets at various times." *Charas*, 160 F.3d at 1266. By extension, UPS's purpose under the FAAAA is the provision of package shipment to and from various markets at various times. *See id.* Internal address correction policies and the placement of packages are akin to amenities rather than components of this purpose. *See Nat'l Fed'n of the Blind*, 813 F.3d at 726; *Charas*, 160 F.3d at 1266. Imposing a common law duty of care in address correction and package placement does not "frustrate[ ] the purpose of deregulation by *acutely* interfering with the forces of competition." *Mendonca*, 152 F.3d at 1189. Furthermore, the requirement that UPS and its agents comport themselves reasonably is "generally applicable" and does not "otherwise regulate prices, routes, or services." *Dilts*, 769 F.3d at 644.

In this context, the compensatory purpose of tort law does not conflict with Congress's intent to preempt state trucking regulation. *See Rowe*, 552 U.S. at 368; H.R. CONF. REP. NO. 103-677, at 82-83, *as reprinted in* 1994 U.S.C.C.A.N. 1715, 1754-55. Indeed, contrary to UPS's arguments, these theories of negligence assert that UPS was negligent for failing to follow its normal practices. (*See* Resp. at 13; *cf.* Mot. at 18 (arguing that Mr. Centuori's claims "would force UPS to abandon its UPS' [sic] internal address verification system" and "implement[ ] an alternative means of correcting labeling errors that would require UPS to develop new systems and processes to complete its service").) Any impact those theories have on UPS's services would therefore be collateral

Centuori v. United Parcel Service, Inc., Not Reported in Fed. Supp. (2017)

Case 1:19-cv-00354-JL   Document 16-5   Filed 08/22/19   Page 6 of 8

and tenuous. *See Duncan,* 208 F.3d at 1115. Accordingly, the court concludes that permitting Mr. Centuori's negligence claims to proceed based on these two theories is consistent with the purposes underlying the FAAAA's preemption provision.[8]

**\*7** In contrast, imposing negligence liability on UPS for failing to obtain Mr. Centuori's consent before delivering the packages would drastically alter the manner in which UPS provides package shipment services to and from various markets at various times. (*See* Resp. at 3 ("The UPS driver left the packages at Mr. Centuori's home when Mr. Centuori was not present and without any kind of prior authorization from Mr. Centuori to leave the packages there unattended.").) Mr. Centuori does not articulate the precise contours of this theory of negligence, but at a minimum, it would require UPS to obtain a recipient's consent every time it reroutes a package to that recipient. This impact is precisely the sort of patchwork regulatory framework that Congress intended to avoid by enacting the FAAAA's preemption provision. H.R. CONF. REP. NO. 103-677, at 83-85, *as reprinted in* 1994 U.S.C.C.A.N. at 1755-57; *see also Charas,* 160 F.3d at 1266. Accordingly, the court grants UPS summary judgment on Mr. Centuori's theory that UPS was negligent for failing to obtain his consent before delivering the packages.

   4. <u>Duty</u>

UPS argues that even if Mr. Centuori's negligence claim is not fully preempted, it fails as a matter of law because UPS owes no duty to Mr. Centuori. (Mot. at 21-23.) Mr. Centuori responds that UPS owes the common law duty to act with reasonable care. (Resp. at 16-17.)

"In a negligence action, in determining whether a duty is owed to the plaintiff, a court must not only decide who owes the duty, but also to whom the duty is owed, and what is the nature of the duty owed." *Keller v. City of Spokane,* 44 P.3d 845, 848 (Wash. 2002). "A duty can arise either from common law principles or from a statute or regulation." *Doss v. ITT Rayonier, Inc.,* 803 P.2d 4, 7 (Wash. Ct. App. 1991). "The class protected generally includes anyone foreseeably harmed by the defendant's conduct regardless of that person's own fault." *Keller,* 44 P.3d at 848 (citing *Hansen v. Friend,* 824 P.2d 483, 487 (Wash. 1992)); *see also Burkhart v. Harrod,* 755 P.2d 759, 766 (Wash. 1988) (quoting *Wells v. Vancouver,* 467 P.2d 292, 295 (Wash. 1970)) ("[A]bsent some special immunity, actors are responsible for the foreseeable consequences of their acts. 'Generally, the duty to use ordinary care is bounded by the foreseeable range of danger.' "); *Rose v. Nevitt,* 355 P.2d 776, 882 (Wash. 1960) ("The duty to use care to avoid injury to others arises from the foreseeability of the risk created."). Injuries incurred by package recipients are a foreseeable risk of UPS's delivery service, and UPS has not demonstrated that it has any sort of "special immunity." *Burkhart,* 755 P.2d at 766. Accordingly, the court concludes that UPS owes Mr. Centuori a common law duty of reasonable care.

UPS replies that Mr. Centuori "improperly relies on internal policies and procedures to define the standard of care." (Reply at 7 (citing *Joyce v. State,* 119 P.3d 825, 834 (Wash. 2005)).) This argument mischaracterizes Mr. Centuori's claim. He asserts that UPS owed him a duty of reasonable care and, under one theory, that UPS breached that duty by failing to follow its package rerouting procedures. (Resp. at 16.) The legal authority that UPS cites does not disallow such a theory of negligence. *See Joyce,* 119 P.3d at 834 (holding that "internal policies and directives generally do not create law," but they may "provide evidence of the standard of care and therefore be evidence of negligence").

In its reply memorandum, UPS also argues that even if a duty of reasonable care exists, UPS did not breach it. (Reply at 6.) UPS did not raise the absence of breach in its motion for summary judgment. (*See* Mot. at 21-23.) Instead, UPS clearly challenged only whether UPS owed a duty to Mr. Centuori. (*See id.*) The court therefore declines to consider UPS's argument regarding breach, which UPS improperly raised for the first time in reply. *See Cray, Inc. v. Raytheon Co.,* 179 F. Supp. 3d 977, 989 (W.D. Wash. 2016).

Mr. Centuori may proceed to trial on the theory that UPS breached its duty of reasonable care in the manner it re-addressed the packages or the manner it placed the packages at Mr. Centuori's home. He may not contend that UPS breached its duty of reasonable care by failing to obtain Mr. Centuori's consent before delivering the packages.

Centuori v. United Parcel Service, Inc., Not Reported in Fed. Supp. (2017)

Case 1:19-cv-00354-JL   Document 16-5   Filed 08/22/19   Page 7 of 8

## IV. CONCLUSION

**\*8** For the reasons articulated above, the court GRANTS in part and DENIES in part UPS's motion for summary judgment. At trial, Mr. Centuori may pursue his negligence claim based on UPS's rerouting the packages and the placement of the packages at Mr. Centuori's home. The court also GRANTS UPS leave to file a *Daubert* motion pertaining to Mr. Wade in the manner described above.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1194497

Footnotes

1  Neither party has requested oral argument, which the court finds unnecessary to its disposition of the motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

2  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

3  Mr. Centuori moves to strike paragraphs 6 to 10 of Rick Norby's declaration. (Resp. at 17-19.) The court treats the facts presented in that declaration in accordance with its ruling below on the motion to strike. *See infra* § III.A.

4  The FAAAA contains another express preemption provision that arguably applies to UPS. Whereas the above-quoted provision, 49 U.S.C. § 14501(c)(1), pertains to motor carriers, a second provision, which the motor carriers provision references, pertains to air carriers and carriers affiliated with direct air carriers, 49 U.S.C. § 41713(b)(4)(A). Courts have applied both preemption provisions to UPS. *See, e.g., W. Parcel Express v. United Parcel Serv. of Am., Inc.*, No. C 96-1526 CAL, 1996 WL 756858, at \*1 (N.D. Cal. Dec. 3, 1996).

   Mr. Centuori does not dispute that Section 14501(c)(1) applies to UPS. (*See* Resp. at 7.) Moreover, regardless of which provision applies to UPS, the preemptive language in both provisions is identical and precludes states from "enact[ing] or enforc[ing] a law ... related to a price, route, or service" of the carriers. *Id.* §§ 14501(c)(1), 41713(b)(4)(A); *see also W. Parcel Express*, 1996 WL 756858, at \*1. Accordingly, the court's analysis herein applies regardless of which FAAAA provision applies to UPS.

5  In 1994, Congress amended the FAAAA's preemption provision to refer to "prices" rather than "rates." *See* H.R. CONF. REP. NO. 103-677, at 83, *as reprinted in* 1994 U.S.C.C.A.N. at 1755; 49 U.S.C. § 14501(c)(1). In so doing, Congress intended "no substantive change to the previously enacted preemption provision in Section 105 of the Federal Aviation Act and [did] not intend to impair the applicability of prior judicial case law interpreting these provisions." H.R. CONF. REP. No. 103-677, at 83, *as reprinted in* 1994 U.S.C.C.A.N. at 1755. Accordingly, where relevant, the court has substituted "prices" for "rates" in the case law that references the prior language.

6  The Supreme Court recently acknowledged that Section 14501(c)(1)'s final clause—"with respect to the transportation of property"—"massively limits the scope of preemption ordered by the FAAAA." *Dan's City Used Cars, Inc. v. Pelkey*, ––– U.S. ––––, 133 S. Ct. 1769, 1779 (2013) (internal quotation marks omitted). The activity here, however, clearly falls within the definition of "transportation," and the parties do not dispute that conclusion. *See* 49 U.S.C. § 13102(23) ("The term 'transportation' includes ... a motor vehicle related to the movement of ... property ... and ... services related to that movement, including ... receipt, delivery, ... handling, ... and interchange of ... property.").

7  The Ninth Circuit has acknowledged that its narrow conceptualization of "service" in the ADA context places it in a minority position among the federal courts of appeals. *See Nat'l Fed'n of the Blind*, 813 F.3d at 727-28 (explaining that the First, Second, Fourth, Fifth, Seventh, Tenth, and Eleventh Circuits adopted a broader definition, whereas the Third Circuit adopted the Ninth Circuit's definition). Because of this difference, the court finds unpersuasive UPS's discussion of *Tobin v. Federal Express Corp.*, 775 F.3d 448, 453-56 (1st Cir. 2014), which based its ADA preemption determination on a definition of "service" that the Ninth Circuit has not adopted. (*See* Mot. at 16-18; Reply at 5.)

8  This conclusion is arguably in tension with *A.C.L. Computers*, in which the United States District Court for the Northern District of California held that the plaintiff's negligence claims against FedEx were preempted under the FAAAA. *A.C.L. Computers*, 2016 WL 946127, at \*3. There, the plaintiff alleged that FedEx failed to prevent third parties' scheme to falsify orders and steal Apple products from the plaintiff. *Id.* at \*1. The plaintiff asserted that FedEx knew or should have known that something was amiss, but did not informed the plaintiff or the suppliers. *Id.* The court dismissed the plaintiff's claims because they "relate[d] directly to FedEx's services—delivery of packages." *Id.* at \*3. The court reasoned that imposing a state standard of reasonableness "in place of the

Case 1:19-cv-00354-JL   Document 16-5   Filed 08/22/19   Page 8 of 8

**Centuori v. United Parcel Service, Inc., Not Reported in Fed. Supp. (2017)**

market forces which currently dictate FedEx's delivery practices" would create the "state regulatory patchwork that the Supreme Court forbade in *Rowe*." *Id.* (internal quotation omitted).

The court is unpersuaded *by A.C.L. Computers*. First, this case is factually distinguishable. Unlike FedEx in *A.C.L. Computers*, UPS does not argue that Mr. Centuori's claim is "related to" UPS's "prices"—only to its services. *Cf. id.* There is also no indication that imposing a standard of reasonableness on UPS would "require services significantly different than what the market might dictate." *Id.* Indeed, Mr. Centuori claims that UPS breached its duty of reasonable care largely by failing to follow the policies and practices that it already has in place. (Resp. at 1.) These claims are not analogous to the claim in *A.C.L. Computers*, which would have held FedEx liable for failing to inquire further into the cause of multiple refused packages. *A.C.L. Computers*, 2016 WL 946127, at *2-3. Second, *A.C.L. Computers* relies on *Tobin*, which applies the First Circuit's more expansive understanding of ADA preemption. *See id.* at *3 (citing *Tobin*, 775 F.3d at 455); *see also supra* n.7.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.