2008 WL 2066948
United States District Court, D. Massachusetts.

Kevin and Nancy O'NEIL, Individually, and as Administrators of the Estate of Liam E. O'Neil, Plaintiffs,
v.
ELECTROLUX HOME PRODUCTS, INC., Husqvarna Forest
and Garden Co., and WCI Outdoor Products, Inc., Defendants.

Civil Action No. 06–10433–DPW.
|
May 14, 2008.

**Attorneys and Law Firms**

Don Wheeler, Center, TX, Roy A. Bourgeois, Bourgeois, Dresser & White, Worcester, MA, for Plaintiffs.

James M. Brogan, Nancy Shane Rappaport, DLA Piper U.S. LLP, Philadelphia, PA, Peter M. Durney, Gregg P. Bailey, Cornell & Gollub, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*

DOUGLAS P. WOODLOCK, District Judge.

 **\*1** While using a riding lawnmower fitted with a grass catcher, Kevin O'Neil accidentally backed over his son Liam killing him. As a result of this tragic accident, Liam's parents, Kevin and Nancy O'Neil (the "O'Neils") filed a diversity action against Electrolux Home Products, Inc. ("Electrolux"), Husqvarna Forest and Garden Co. ("Husqvarna"), and WCI Outdoor Products, Inc. ("WCI") (collectively, the "Defendants"), the companies that designed, manufactured, marketed and sold the lawnmower and grass catcher. [1] The O'Neils, as administrators of the estate of their son, assert claims against the Defendants for negligence and gross negligence; willful, wanton and reckless misconduct; breach of warranty; and violations of M.G.L. Chapter 93A. In addition, they individually raise claims of negligent infliction of emotional distress, breach of warranty, and violations of M.G.L. Chapter 93A. The Defendants have moved for summary judgment in their favor as to all claims in the litigation.

## I. BACKGROUND

**A. Factual Background**

**1. The Lawnmower and Grass Catcher**

In May of 2002, Kevin O'Neil purchased a Husqvarna Model YTH1542XP riding lawnmower that came fitted with a Model QC42A grass catcher (collectively, "Tractor"). Mr. O'Neil is a licensed heavy equipment operator and owns a construction business. He purchased the Tractor from the dealer who sold him heavy equipment for his business.

The Tractor was equipped with four safety systems. The first two systems prevented the Tractor from being started unless the blades were off and the wheel brakes were applied. The third system stopped the engine and blades automatically if the operator left the seat without disengaging the lawnmower blades. The fourth system stopped the engine if the operator left the seat without setting the parking brake. After consulting with the Tractor dealer regarding a faulty connector and switch, Mr. O'Neil repaired the Tractor himself, resulting in the disablement of the third and fourth safety systems.

At the time of purchase, the Tractor conformed with industry standards set by the American National Standards Institute ("ANSI"). In 2003, ANSI revised its standards, and in order to maintain their voluntary compliance, the Defendants needed to change their lawnmower control system. Specifically, an additional control was added that required the operator to make a conscious choice to operate in reverse with the blades engaged. If the operator shifted the lawnmower into reverse while the blades were engaged, the engine would automatically be shut-off. A separate operating mode was created, and when selected by the operator, this mode allowed the lawnmower to be operated in reverse with the blades engaged.

When Mr. O'Neil purchased the Tractor, he received the lawnmower owner's manual. Although he remembers briefly reviewing the manual, he admits that he did not look at the safety rules it contained. In the safety rules section, the manual warns:

**\*2** Tragic accidents can occur if the operator is not alert to the presence of children. Children are often attracted to the machine and the mowing activity. *Never* assume that children will remain where you last saw them.

• Keep children out of the mowing area and under the watchful care of another responsible adult.

• Be alert and turn machine off if children enter the area.

• Before and when backing, look behind and *down* for small children.

• Never carry children. They may fall off and be seriously injured or interfere with safe machine operation.

• Never allow children to operate the machine.

• Use extra care when approaching blind corners, shrubs, trees, or other objects that may obscure vision.

In addition, the safety rules section provides pictorial warnings depicting a person being run over as the lawnmower is operated in reverse. The grass catcher had a separate owner's manual, but Mr. O'Neil does not recall ever receiving or reading this document. This manual provided the same warnings with regard to children. Neither manual provided a warning regarding visibility restrictions created by the grass catcher attachment on the lawnmower. The O'Neils never received an instructional video that was supposed to come with the Tractor.

The grass catcher extends about two feet from the back of the lawnmower limiting rearward operator visibility. The lawnmower shifter is located on the right, which encourages the operator to look over his or her right shoulder. But the grass catcher attachment is off-center and is actually higher on the right side of the lawnmower than on the left side. The police officer investigating the accident and both parties' experts concluded that a blind spot existed when a Tractor operator looked behind to reverse:

• According to the police officer investigating the accident, a 5′10″ person seated on the Tractor could only see the grass beginning four feet beyond the end of the grass catcher and anything closer was obscured by the grass catcher.

• According to the Defendants' expert Mr. Boylston, "on this machine, with regard to the grass catcher, if you're looking to the right, as Mr. O'Neil says he was, then there would be an area directly behind the grass catcher that you couldn't see down through the grass catcher."

• Mr. Coons, another expert for the Defendants, stated in his report: "There is only a very small area immediately behind the bagger attachment where Liam may not have [been] visible to the operator."

• The Plaintiffs' expert, Mr. Warren, noted in his report that the addition of the grass catcher attachment on the lawnmower "increased the operator's blind spot particularly on areas where the ground drops off behind the tractor" and "negated any utility of mowing in reverse because the operator cannot see the mow lines while traveling in the reverse direction" leading to reduced visibility and reduced utility.

*3 • After reviewing two visibility studies created by Husqvarna Outdoor Products, Inc., Mr. Warren's Supplemental Report indicated that a "20 inch blind spot at ground level" exists for the lawnmower in the study. With the grass catcher attachment, "the ground level blind spot increases to between 128 to 180 inches [$10\ 2/3''$ to $15''$] as measured from the rear of the mower."

### 2. The Back–Over Accident

The O'Neils' yard comprises three sections: a front yard, a backyard directly behind the house, and a backyard across the driveway that contained a swing set. On September 12, 2004, Mr. O'Neil used the Tractor to mow the front lawn while Mrs. O'Neil and their two sons, two and one-half year old Liam and eight month old Aidan, played in the backyard. When Mr. O'Neil finished mowing the front yard, he started to mow the yard directly behind their house, and Mrs. O'Neil moved the children to the other side of the driveway where the swing set was located. When Mr. O'Neil finished mowing the section directly behind the house, he moved to the opposite side of the driveway to continue mowing and Mrs. O'Neil brought the children back to the area directly behind the house.

At some point after moving back to the area directly behind the house, Aidan fell asleep. Liam was riding his toy tractor at the time, and Mrs. O'Neil motioned to her husband that she was going inside to put Aidan in bed. Mr. O'Neil continued to mow the lawn until the Tractor reached a tree in the yard. At this point, he began to reverse the Tractor to get enough room to turn it around.

Mr. O'Neil followed his customary practice of not disengaging the lawnmower blades when he operated the Tractor in reverse, except in areas with stones. On this particular occasion, he looked over his right shoulder prior to reversing but cannot remember if he also looked to the left. He told police he reversed for approximately six feet, but at his deposition, he stated that he reversed for about fifteen feet before feeling a bump that caused him to stop the Tractor. He then pulled the Tractor forward, shut it off, and discovered his son on the ground. Liam O'Neil died shortly thereafter. The O'Neils estimate that Mrs. O'Neil was inside the house for anywhere from one minute to five minutes before the accident occurred.

### 3. Back-over Accidents

In 2003, the Defendants had approximately 35 percent of the market share for lawn tractors in the U.S. that matched the O'Neil Tractor model. This amounted to the manufacture of approximately 700,000 tractors annually. At the time the O'Neil Tractor was manufactured, the Defendants were aware of 29 claims of serious injuries to children caused by back-over accidents. By the end of 2004, the number of incidents had risen to 35 or 40.

Over the years, lawnmower manufacturers have considered various options to reduce the number and severity of back-over accidents caused by lawnmowers operated in reverse. One of the first companies to add a no-mow-in-reverse system to all of its riding lawnmowers was MTD, which implemented the system in 1982. In the Defendants' own material, they noted:

*4 Industry standards are being implemented that will force new back-over protection systems to be installed on all consumer mowing machines within the next two years.

The systems implemented to reduce these injuries are in no way intended to replace the operator's responsibility to keep bystanders out of the mowing area or to look carefully behind the tractor before and during reverse motion. The reverse control devices are intended to assist in increasing the operator's awareness while in reverse motion. The inclusion of reverse control systems offer added safety that may reduce the incidents or severity associated with back-over blade contact in some indeterminate way.

To date John Deere, Toro, and Snapper have already introduced back-over blade contact systems within the past two seasons. MTD has had a system in place since 1982. [Electrolux] had been in development of a reverse control system for several years,

but all previous solutions presented opportunities for improvement. [Electrolux] has now developed innovative technology that preserves the vehicle utility while providing dependable and structurally sound back-over protection.

Although the evidence is not conclusive, the Plaintiffs assert that this material was produced by the Defendants years before the O'Neil Tractor was built.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and affidavits show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Where the party that does not have the burden of proof at trial moves for summary judgment by showing that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to show that a genuine issue of material fact exists. *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).

### B. Breach of Warranty

The Defendants argue that the breach of warranty claims fail as a matter of law, because there is no evidence that the Tractor was unreasonably dangerous to the intended user or consumer when it left the Defendants' control nor is there evidence that additional product warnings would have prevented this accident. Under Massachusetts law, a manufacturer provides an implied warranty of merchantability that its goods "are fit for the ordinary purposes for which [the] goods are used". Mass. Gen. Laws ch. 106 § 2–314(2)(c). The Massachusetts legislature "has transformed warranty liability into a remedy intended to be fully as comprehensive as the strict liability theory of recovery". *Back v. Wickes Corp.,* 378 N.E.2d 964, 968 (Mass.1978). A breach of warranty may be established if the product is found to have a defective design or inadequate warnings. *See Haglund v. Philip Morris Inc.,* 446 Mass. 741, 747 (2006); *Marchant v. Dayton Tire & Rubber Co.,* 836 F.2d 695, 698 (1st Cir.1988).

#### 1. Design Defect

*\*5* The O'Neils claim that the Tractor design was defective, because its blades continued to cut when the operator put the Tractor in reverse, increasing the risk of injury from lawnmower back-over accidents. The pre-attached grass catcher, they contend, exacerbated this design defect by further limiting rearward visibility.

A product design is considered unreasonably dangerous and hence, defective, if it is not fit for "both those uses which the manufacturer intended and those which are reasonably foreseeable." *Back,* 378 N.E.2d at 969. "[A] manufacturer must anticipate the environment in which its product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting." *Id.* The Defendants' experts agree that "lawnmower manufacturers expect that there will be situations where ... children will be allowed to be close, in the proximity of the machines, while they're operating." Although the Defendants did not intend for the Tractor to be used around children (as indicated in the numerous written and pictorial warnings), it was foreseeable that the Tractor would be purchased for residential mowing and that children might be near the Tractor while it was in operation.

Whether a product design is unreasonably dangerous depends on the reasonable expectations of the consumer. *Back,* 378 N.E.2d at 970. Although the O'Neils argue that ordinary consumer knowledge has no significance in Massachusetts product liability cases, I consider this proposition to be unsupported. The Supreme Judicial Court has "equated a breach of the implied warranty of merchantability, that goods be 'fit for the ordinary purposes for which such goods are used,' with the sale of an 'unreasonably dangerous' product". *Commonwealth v. Johnson Insulation,* 425 Mass. 650, 660 (1997) (citations omitted). A product "is not unreasonably dangerous merely because some risk of harm is associated with its use, but only where it is dangerous 'to an extent

beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics .' " *Id.* (quoting Restatement (Second) of Torts § 402A cm t. i).

The Defendants argue that the Tractor was not unreasonably dangerous since its "sharp steel rotating blades" were not anymore dangerous than what the ordinary consumer expected. They rely on *Mavilia v. Stoeger Indus.,* 574 F.Supp. 107 (D.Mass.1983), which granted summary judgment in favor of a gun manufacturer in a product liability case. The court in *Mavilia* found that "all Americans from an early age" know "that death may result from careless handling of firearms". 574 F.Supp. at 111. The Defendants refer to Mr. O'Neil's deposition, where he stated that "anybody over the age of 5 would know" what happens when a body part is put in the path of the Tractor's rotating blades, to support their argument that ordinary consumers understand the dangers posed by the Tractor's blades.

 **\*6** But *Mavilia* is distinguishable. A firearm, even when properly operated, is designed to inflict harm on its target. A lawnmower, even when operated in reverse, is not designed to cut anything more than grass. Although ordinary consumers understand the general dangers of human contact with sharp, rotating blades on a lawnmower, they may not be fully aware of all of the specific risks posed by the Tractor. *See Cigna Ins. Co. v. Oy Saunatec, Ltd.,* 241 F.3d 1, 13 (1st Cir.2001). These risks include the existence of blind spots that increase the likelihood of back-over accidents involving small children. Both the investigating police officer and the parties' experts indicated that the grass catcher attachment created or exacerbated the problem of a blind spot—the operator could not see the area directly behind the Tractor.

The Defendants rely on three cases to support their argument that their Tractor design is not defective as a matter of law. Federal courts applying Maryland, Utah, and Oklahoma law have granted summary judgment for the manufacturer and seller defendants in lawnmower product liability cases. *See Clayton v. Deere & Co.,* Civil No. AMD 05–3377, 2007 WL 1875915 (D. Md. June 27, 2007); *Britton v. Electrolux Home Prods., Inc.,* No. CIV–05–1322–F, 2006 WL 2934271 (W.D.Okla. Oct. 13, 2006); *Brown v. Sears, Roebuck & Co .,* 328 F.3d 1274 (10th Cir.2003). These states all apply an objective consumer expectations test. *See Clayton,* 2007 WL 1875915, at \*3; *Britton,* 2006 WL 2934271, at \*3; *Brown,* 328 F.3d at 1282. Under this test, "[a]n ordinary and prudent user of the mower would have appreciated the danger arising from the operation of the mower blades while the tractor was moving in reverse." *Brown,* 328 F.3d at 1283. On the other hand, another federal district court, applying the consumer expectations test under Washington state law, reached the opposite conclusion: "The defendants contend that ordinary consumers understand the danger of personal injury posed by rotation of sharp, steel blades and that the danger is obvious whether the tractor is moving forwards or backwards. The plaintiff contends that the danger of backing over a child is not obvious to ordinary consumers because the design of the tractor creates a blind spot. There is evidence in the record to support this assertion." *D.C. v. Sears, Roebuck & Co. et al.,* C06–5391RJB, at 9 (W.D.Wash. July 24, 2007). This debate within the case law regarding ordinary consumer expectations as to riding lawnmowers does not include cases involving a lawnmower with a grass catcher attachment that created or enlarged the blind spot behind the Tractor.

For a breach of warranty claim, the analysis of a product design "focuses on the product's features, not the seller's conduct." *Haglund,* 446 Mass. at 747. "Thus, warranty liability may be imposed ... even where the consumer used the product negligently ." *Id.* at 748. Product design is evaluated based on factors including "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Back,* 378 N.E.2d at 970 (quoting *Barker v. Lull Eng'r Co.,* 20 Cal.3d 413, 431 (1978)). These factors aid the fact-finder in making "a judgment as to the social acceptability of the design". *Id.*

 **\*7** The Plaintiffs have raised a genuine issue as to the gravity of the danger posed by the Tractor design and the likelihood that such danger would occur. The existence of a blind spot appears to be supported by the Defendants' own visibility studies and corroborated by the investigating officer and experts. Although the Defendants claim that the likelihood of injury "is minimal when the lawn tractor is used responsibly and in accordance with common sense, and [the Defendants'] warnings and instructions," they do not address the fact that the Defendants failed to provide warnings and instructions regarding the impact of a grass catcher attachment on visibility.

The factors related to an alternative design turn on whether the Plaintiffs' proposed alternatives are actually safer. The Defendants claim that "there is no admissible evidence demonstrating that any alternative design proposed by plaintiffs is safer than the design of the subject tractor." The Defendants focus on the Tractor's user safety systems while the Plaintiffs discuss various alternatives that incorporate child safety systems. Some of these designs preclude lawnmower reverse operation while the blades are engaged; others "allow operators to make a conscious decision to override their safety systems" in order to mow in reverse. By contrast, the Plaintiffs contend that the O'Neil Tractor "makes the decision to mow in reverse for the operator unless the operator overrides that decision."

The Plaintiffs have introduced evidence sufficient for a fact finder to conclude that prior to the manufacture of the O'Neil Tractor, the Defendants had already "developed innovative technology that preserves the vehicle utility while providing dependable and structurally sound back-over protection." Other manufacturers had implemented child safety systems in their lawnmowers, and the Defendants noted in their own material that "[i]ndustry standards are being implemented that will force new back-over protection systems to be installed on all consumer mowing machines." Although the Plaintiffs "need only convince the jury that a safer alternative design was feasible, not that any manufacturer in the industry employed it or even contemplated it," *Haglund, 847 N.E.2d at 323,* they have arguably gone further with evidence that other manufacturers employed child safety systems and the Defendants themselves had developed additional back-over protection technology.

The Plaintiffs must prove causation in order to recover under a breach of liability claim. "[A] plaintiff must prove that his or her injury was, more probably than not, caused by a defect in the product." *Kearney v. Philip Morris, Inc., 916 F.Supp. 61, 64 (D.Mass.1996).* The Defendants claim the Plaintiffs cannot prove causation since no evidence indicates the Tractor has a blind spot going back as far as fifteen feet, but this assertion is not quite accurate. Fifteen feet is within, albeit at the limit of, the blind spot zone discussed in the Supplemental Report of the Plaintiffs' expert. In any event, given the difficulties in estimating and recollecting distances by lay persons accurately, there is a question of fact as to precisely how far Mr. O'Neil reversed (he gave inconsistent estimates of six feet—to the police—and 15 feet—in his deposition) before backing over his son. Thus, a reasonable jury could find that the existence of a blind spot created by the grass catcher attachment led to the back-over accident.

*8 I find that genuine issues of material fact exist regarding the design defect warranty theory. Accordingly, I will deny the Defendants' motion for summary judgment on that theory.

### 2. Inadequate Warnings

The Plaintiffs claim that the Defendants breached their implied warranty by failing to provide adequate warnings to consumers about the visibility restrictions caused by the grass catcher attachment on the lawnmower. The adequacy of a warning is determined based on "whether the warning is comprehensible to the average user and whether it conveys a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person." *Marchant, 836 F.2d at 701.* Although both the lawnmower and grass catcher came with their own safety manuals, neither provided a warning as to the impact on visibility when the grass catcher is attached to the lawnmower. There was no warning regarding the existence of a blind spot or the fact that visibility was reduced on the right side more so than on the left side.

Even assuming that the Defendants' warnings were inadequate, however, the Plaintiffs must still show causation: "[W]ould a more complete warning have prevented the accident?" *Lussier v. Louisville Ladder Co., 938 F.2d 299, 301 (1st Cir.1991).* Mr. O'Neil admits he did not read the safety rules in the lawnmower owner's manual, nor does he recall looking at the pictorial warnings on the lawnmower itself. Even if the Defendants had provided a fuller warning that told users to look over both shoulders rather than just "look behind and down for small children" and emphasized the existence of a blind spot due to the grass catcher attachment, it would have made no difference. Mr. O'Neil did not read the safety rules so he never would have seen the revised warnings.

"Because an adequate instruction would not have enhanced the [Plaintiffs'] existing knowledge as to" the visibility limitations imposed by the grass catcher attachment, "the inadequacy of the warning did not proximately cause the ... injuries." *Lussier,*

938 F.2d at 302. Accordingly, I find that as a matter of law, the Plaintiffs' breach of warranty claim premised on an inadequate warning theory must fail.

**C. Negligence and Other Claims**

Although negligent design and breach of warranty claims share similarities, each has "distinct duties and standards of care." *Colter v. Barber–Greene Co.,* 403 Mass. 50, 61 (1988). Rather than focusing on the product characteristics, negligent design turns on the actions of the manufacturer. *See id.* at 61–62. Negligent design "places an increased responsibility for ensuring the safety of a product 'upon the manufacturer, who stands in a superior position to recognize and cure defects.' " *Cigna,* 241 F.3d at 15 (quoting *Uloth v. City Tank Corp.,* 376 Mass. 874 (1978)).

The Defendants move to dismiss the negligence and Chapter 93A claims based solely on their argument that the breach of warranty claims fail as a matter of law. The Defendants note that they "cannot be found to have been negligent without having breached the warranty of merchantability." *Colter,* 403 Mass. at 62. Because I find that there are genuine issues of material fact regarding the breach of warranty claims on the design defect theory, there is no basis to dismiss the other claims based solely on the Defendants' argument that the breach of warranty claims fail. Accordingly, I will deny the Defendants' motion for summary judgment as to these claims.

**D. Punitive Damages**

*9 The Plaintiffs may recover punitive damages if they can establish that Liam O'Neil's death was caused by the Defendants' willful, wanton or reckless conduct or by their gross negligence. Pursuant to Mass. Gen. Laws ch. 229 § 2, a plaintiff in a wrongful death action may recover "punitive damages in an amount of not less than five thousand dollars in such case as the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant". The Supreme Judicial Court has defined wilful, wanton or reckless conduct to be "intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." *Manning v. Nobile,* 411 Mass. 382, 387–388 (1991).

The Plaintiffs have failed to adduce evidence that the Defendants thought there was a high degree of likelihood that a back-over accident would occur. The Defendants knew of at least 29 serious injuries caused by lawnmower blade contact at the time the O'Neil Tractor was manufactured. This number rose to 35 or 40 at the end of 2004. Based on these numbers, 11 accidents occurred between 2002 and 2004 or in the worse scenario, about 5 accidents per year. The Defendants manufactured around 700,000 lawnmowers annually and included numerous warnings about the risks of operation around children on all of their lawnmowers. This conduct does not rise to the level of wilful, wanton or reckless conduct.

The Supreme Judicial Court has defined gross negligence as negligence that is:

> substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence.

*Altman v. Aronson,* 231 Mass. 588, 591–592 (1919). Even if the Defendants were negligent in designing their Tractor and providing adequate warnings, the Tractor did include user safety systems and the evidence indicates the Defendants were researching the possibility of adding child safety systems. They did not violate the ANSI industry standards nor were they required to follow these voluntary standards. In addition, they provided numerous warnings against the use of the Tractor around children.

**\*10** There is a legal distinction between ordinary negligence and gross negligence. The Defendants' actions do not fall to the level of "the absence of slight diligence, or the want of even scant care ." Thus, as a matter of law, I find the Defendants were not grossly negligent. Accordingly, I will grant the Defendants' motion for summary judgment as to punitive damages.

### III. CONCLUSION

For the reasons stated more fully above, I GRANT in part and DENY in part the Defendants' Motion for Summary Judgment.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2066948, Prod.Liab.Rep. (CCH) P 18,005

Footnotes

1   Husqvarna Outdoor Products, Inc. is the successor in interest to the outdoor products division of Electrolux Home Products, Inc. and the successor corporation to WCI Outdoor Products, Inc.

---

**End of Document**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.